# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2280

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of South Dakota. |
| Nicholas Turning Bear, III, also known | * | |
| as Nicholas Turning Bear, Jr., III, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 16, 2003

Filed: February 2, 2004

_____

Before MORRIS SHEPPARD ARNOLD, HEANEY, and FAGG, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Nicholas Turning Bear, III, was convicted by a jury of five counts of aggravated sexual abuse of his son and daughter, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2). Mr. Turning Bear's son, N.T.B., was between the ages of four and six during the period over which the offenses were alleged to have occurred, and his daughter, M.T.B., was between the ages of one and three during this time. The government's case rested largely on statements that the two children made during the course of the investigation and at trial. Mr. Turning Bear made no incriminating admissions, and there was no eyewitness testimony from third parties. A physical

examination of M.T.B. revealed some evidence that was consistent with, but did not necessarily indicate, sexual abuse. Much of the government's case thus hinged on the credibility of the two alleged victims.

Mr. Turning Bear appeals, contending that three separate constitutional errors were made during his trial. He first asserts that the district court erred in ruling inadmissible the opinion testimony of a witness regarding the untruthfulness of N.T.B., thereby violating his fifth and sixth amendment rights to present witnesses in his defense. He also maintains that the district court violated his sixth amendment right of confrontation by ruling that M.T.B. could testify by closed-circuit television. Finally, he urges us to hold that the court again denied him his right of confrontation by admitting a videotape of M.T.B.'s out-of-court statements to a forensic interviewer. In addition to his constitutional arguments, he argues that the district court committed two sentencing errors. After reviewing the district court's conclusions of law *de novo* and its findings of fact for clear error, *see United States v. Yousif*, 308 F.3d 820, 827 (8th Cir. 2002), we reverse and remand this case to the district court for further proceedings.

## I.

Mr. Turning Bear subpoenaed Gloria Odens, the foster care parent with whom both children had lived following the initial report and investigation of abuse. Ms. Odens testified that she saw N.T.B. on a daily basis during the four to six months that he resided with her, and that she believed that she was in a position to give an opinion as to his truthfulness or untruthfulness. She offered to testify that, based on her daily contact with N.T.B. over these several months, she had formed an opinion that he "was untruthful" and "didn't always tell the truth." The district court ruled the proffered opinion testimony inadmissible because it was "strictly her personal opinion and that would be a slippery slope." The district court also agreed with the government's argument that the opinion testimony would be "illegal vouchering" and concluded that the testimony would be "outside the rules of evidence."

Criminal defendants have a fundamental right to present the testimony of witnesses in their defense, a right grounded in the fifth and sixth amendments. *See Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988); *Washington v. Texas*, 388 U.S. 14, 18-19 (1967). A defendant cannot establish a violation of this right to offer testimony merely by showing that the court deprived him of that testimony; rather, he must "at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Arbitrarily excluding proffered testimony can violate the right to present a defense where there is no claim of a discovery violation against a defendant proffering a witness's testimony and that testimony is otherwise admissible under the rules of evidence. While "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), Mr. Turning Bear contends here that the district court did not properly rely on any cognizable evidentiary rule in excluding his proffered evidence.

Mr. Turning Bear's defense focused largely on the lack of believability and reliability of the alleged victims, and he attempted to offer the opinion testimony of Ms. Odens to help establish this defense by attacking the credibility of N.T.B. Federal Rule of Evidence 608(a) provides that the "credibility of a witness may be attacked ... by evidence in the form of opinion" subject to the limitation that "the evidence may refer only to character for ... untruthfulness." Admissibility of opinion testimony by lay witnesses is further limited by Rule 701, which requires that the testimony be "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' [sic] testimony or the determination of a fact in issue."

We have stated that opinion testimony about the truthfulness or untruthfulness of a witness may be excluded " 'if it amounts to no more than a conclusory observation,' " *United States v. Cortez*, 935 F.2d 135, 139 (8th Cir. 1991), *cert.*

-3-

*denied*, 502 U.S. 1062 (1992) (quoting *United States v. Dotson*, 799 F.2d 189, 193 (5th Cir. 1986)), or if the opinions were not " 'more than bare assertions,' " *United States v. McMurray*, 20 F.3d 831, 834 (8th Cir. 1994) (quoting *Dotson*, 799 F.2d at 193). An adequate foundation must be laid in order for opinion testimony concerning another witness's character for untruthfulness to be admissible. Such a foundation is laid by demonstrating that the opinion witness knows the relevant witness well enough to have formed an opinion. *See, e.g., McMurray*, 20 F.3d at 834; *Cortez*, 935 F.2d at 139-40; *cf. United States v. Oliver*, 492 F.2d 943, 946 (8th Cir. 1974).

Whether there has been an adequate showing that proffered opinion testimony regarding a witness's truthfulness amounts to "more than bare assertions" is generally a question committed to the trial court's discretion, *McMurray*, 20 F.3d at 834, but here the district court did not conclude that the foundation was inadequate or that Mr. Turning Bear otherwise failed to meet the requirements of Rules 608 and 701. We think that Mr. Turning Bear laid a sufficient foundation for Ms. Odens's testimony. Because Ms. Odens had had daily contact with N.T.B. over the four-to-six-month period that he lived in her home, she knew him well enough to have formed an opinion about his character for untruthfulness that was more than a "bare assertion" or "conclusory observation." We believe that the proffered testimony quite clearly complied with the requirements of Rules 608 and 701.

The government argues, however, that the district court acted within its discretion under Federal Rule of Evidence 403 in excluding the opinion testimony, even though it was otherwise admissible under Rules 608 and 701. Rule 403 allows the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." And Rule 608(a) does not state that evidence meeting its requirements *must* be admitted; it states that the "credibility of a witness may be attacked" by opinion evidence that meets certain requirements.

-4-

While the Eighth Circuit has not directly addressed the issue, the Fifth Circuit has concluded that evidence admissible under Rule 608(a) may be excluded under Rule 403 "if its probative value is substantially outweighed by its needlessly cumulative nature," subject to the caveat that such an exclusion of testimony sought to be presented by a criminal defendant must not be used in a way that violates the defendant's sixth amendment rights. *United States v. Davis*, 639 F.2d 239, 244 (5th Cir. 1981). We agree, but the proffered opinion testimony here was clearly not needlessly cumulative. The credibility of N.T.B.'s testimony was one of the central issues in the case, and it was thus critical that material evidence relating to its veracity be admitted for the jury's consideration. In this case, the district court did not identify, nor can we independently discern, sufficient harm from unfair prejudice or any other proper Rule 403 consideration that would "substantially outweigh" the probative value of the highly relevant and otherwise admissible opinion testimony proffered by Mr. Turning Bear. The district court's decision to exclude Ms. Odens's testimony because "[t]hat's strictly her personal opinion and that would be a slippery slope" was not an appropriate application of Rule 403.

Because the district court's exclusion of Ms. Odens's testimony was not proper under Rule 403 or any other evidentiary rule or principle that we can identify, and the testimony was clearly relevant to one of the central issues of the case, we hold that the exclusion violated Mr. Turning Bear's constitutional right to put on witnesses in his defense. While a defendant's "right to present relevant testimony ... 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process,' " *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers*, 410 U.S. at 295), the district court's exclusion of Ms. Odens's testimony, which would have been material and favorable to Mr. Turning Bear's defense, served no such legitimate interest.

## II.

The district court ruled that M.T.B.'s examination could be conducted by closed-circuit television after she cried and exhibited distress at the beginning of her testimony in the presence of the jury. Before commencing the closed-circuit testimony, the court held a hearing in chambers. At the hearing, when the court asked M.T.B. the open-ended question, "Why didn't you want to talk, honey?", she replied, "Because I was scared to talk in front of them people." When the court then asked, "Honey, is there any person that you are scared of?", M.T.B. said that she was scared of the prosecuting attorney. Only in response to leading questions by the prosecuting attorney did M.T.B. eventually indicate (by nodding her head) that she was also frightened by the presence of her father in the courtroom. Following additional questioning of M.T.B. by the prosecuting attorney, Mr. Turning Bear's counsel, and a foster parent, the district court made the following findings: "I find that the child would be unable to testify in the courtroom because of fear. It's clear to me that she is afraid of her father, and that she is afraid of the jury as well, and [the prosecuting attorney], apparently. And that's a combination. ... I find that the child is unable to testify because of fear of the defendant, the jury, and [the Assistant United States Attorney]. And it is intimidating to be in that very large courtroom for anyone."

Mr. Turning Bear maintains that the use of the closed-circuit television at his trial violated his sixth amendment right of confrontation. We agree, because the district court failed to make an adequate case-specific finding of necessity in conformance with the requirements outlined in *Maryland v. Craig*, 497 U.S. 836, 855-60 (1990).

The district court was required to make certain findings in order to permit M.T.B. to testify by closed-circuit television. Whether the district court's relevant factual findings were supported by evidence in the record is reviewable under the "clearly erroneous" standard, but whether those findings were sufficient to permit the

use of closed-circuit television testimony consistent with Mr. Turning Bear's constitutional right of confrontation is a legal issue that we review *de novo*.

The confrontation clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." As a general matter, "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016, 1020 (1988). "That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult." *Id.* at 1020.

The right to face-to-face confrontation, however, is not absolute. The Supreme Court has recognized a narrow exception to this right for certain child witnesses, reasoning that an "interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Craig*, 497 U.S. at 853. *Craig* held that the use of a closed-circuit television procedure that permits a child witness in a child abuse case to testify at trial against a defendant in the absence of face-to-face confrontation is permissible if the trial court makes an adequate "case-specific" finding of "necessity." *Id.* at 855.

This finding of necessity has three mandatory components: first, the "trial court must hear evidence and determine whether use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify"; second, the "trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and third, "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.,* more than mere nervousness or excitement or some reluctance to testify." *Id.* at 856 (internal quotations omitted).

In explaining the reason for the requirement that the child witness must be traumatized by the presence of the defendant particularly, the Supreme Court noted that if the "interest were merely ... in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present." *Id.* Any trauma or fear created by elements present in the courtroom other than the defendant is irrelevant to the inquiry whether the closed-circuit television testimony is constitutionally permissible. The proper inquiry is whether the presence of the defendant, standing alone, would trigger the requisite level of trauma in the witness.

The district court found that M.T.B. was "unable to testify in the big courtroom" because of fear of a "combination" of the presence of her father, the jury, and the prosecutor, as well as intimidation from being in the "very large courtroom." We conclude that these findings were legally insufficient to justify the use of the closed-circuit television testimony because they failed to satisfy the requirement that M.T.B. "be traumatized, not by the courtroom generally, but by the presence of the defendant."

The district court's finding of fear seemed to be dependent upon the testimony occurring in a particular physical location, as it specifically found that M.T.B. would be unable to testify "in the big courtroom" because of fear arising from the various sources. The physical location of the testimony, however, is irrelevant to the face-to-face confrontation inquiry, as "the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present." *Id.*

The district court, moreover, did not make particularized findings as to the existence or magnitude of any trauma specifically caused by the presence of Mr. Turning Bear, without regard to the size of the courtroom or the presence of the prosecutor and jury. Indeed, the court was aware that M.T.B. had successfully

testified on the previous day during a motion hearing outside the presence of the jury when her father had been present, and that during the hearing on the propriety of closed-circuit testimony M.T.B. had indicated that the "people in the jury scare [her] more than [her] dad being in the courtroom," considerations that likely led it to attribute her disabling fear at trial to a "combination" of conditions rather than the presence of her father alone. We think that this situation is similar in relevant respects to *Hoversten v. Iowa*, 998 F.2d 614, 616-17 (8th Cir. 1993), in which we upheld an order granting a defendant a writ of habeas corpus because the "trial court's finding of necessity was based upon the 'traumatic experience of testifying in open court,' a consideration expressly held in *Craig* to be insufficient," *id.* at 616. Because the district court failed to separate out the effect on M.T.B. of her father's presence, this case is distinguishable from *United States v. Rouse*, 111 F.3d 561, 568-69 (8th Cir. 1997), *cert. denied*, 522 U.S. 905 (1997), in which we upheld the use of closed-circuit testimony where the district court had found that the alleged abusers' presence in the courtroom would "more than anything else prevent [the child witness] from testifying," *id.* at 568.

### III.

Mr. Turning Bear next argues that the admission at trial of a twelve-minute videotape of M.T.B.'s previous out-of-court statements to a forensic interviewer violated the confrontation clause of the sixth amendment. The videotaped interview at issue took place after the children had been taken into custody by the South Dakota Department of Social Services following a referral alleging that M.T.B. had been sexually abused and after a preliminary investigation into those allegations. Colleen Brazil, a forensic interviewer, conducted the interview at a center for child evaluation before a physical examination by a doctor.

The confrontation clause "does not necessarily prohibit the admission of hearsay statements against a criminal defendant." *Idaho v. Wright*, 497 U.S. 805, 813 (1990). It does, however, bar "the admission of some evidence that would otherwise

be admissible under an exception to the hearsay rule." *Id.* at 814. Out-of-court statements incriminating a defendant may not be admitted without violating the confrontation clause unless two requirements are met. First, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Ohio v. Roberts*, 448 U.S. 56, 65 (1980). Second, "if the witness is shown to be unavailable ... his statement is admissible only if it bears adequate 'indicia of reliability' " either because it "falls within a firmly rooted hearsay exception" or it is supported by "a showing of particularized guarantees of trustworthiness." *Id.* at 65-66 (footnote omitted); *see also Wright*, 497 U.S. at 814.

We have recognized that the admission of hearsay evidence against a criminal defendant generally does not violate the confrontation clause, regardless of whether the evidence bears adequate indicia of reliability, where "the hearsay declarants ... actually appear in court and testify in person." *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1473 (8th Cir. 1991), *cert. denied*, 502 U.S. 1101 (1992). We have also held that a victim's testimony by closed-circuit television counts as actually appearing in court and testifying in person for confrontation clause purposes. *Rouse*, 111 F.3d at 569-70. M.T.B. testified by closed-circuit television at Mr. Turning Bear's trial. As explained above, however, M.T.B.'s closed-circuit television testimony violated Mr. Turning Bear's sixth amendment right of confrontation and should not have been considered by the jury. We thus cannot consider that testimony when determining whether admission of the hearsay videotape satisfied the confrontation clause. Because M.T.B. did not testify "in person" at trial in a legally permissible manner, the issue presented is whether the government, as the proponent of the videotape evidence presumptively barred by the hearsay rule and the confrontation clause, has carried its burden of proving that M.T.B.'s incriminating statements to Ms. Brazil bore sufficient indicia of reliability to withstand scrutiny under the clause.

The district court evidently admitted the videotape evidence under both the residual hearsay exception, *see* Fed R. Evid. 807, and the hearsay exception allowing admission of statements made for the purposes of obtaining medical diagnosis and treatment, *see* Fed. R. Evid. 803(4). While the court cited only Rule 807 at the time that it admitted the evidence, it later mentioned Rule 803(4) as an alternative basis for admission of the hearsay.

The residual hearsay exception "accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial." *Wright*, 497 U.S. at 817. The residual exception is not firmly rooted for confrontation clause purposes because hearsay statements admitted under it "do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception." *Id.* Thus, even if the videotape were admissible under Rule 807, that would not be enough to establish that the evidence had adequate "indicia of reliability" for confrontation clause purposes.

The rule allowing admission of statements made for the purposes of medical diagnosis or treatment "is widely accepted as a firmly rooted hearsay exception." *United States v. Sumner*, 204 F.3d 1182, 1185 (8th Cir. 2000). This hearsay exception is based on the rationale that "the patient's selfish interest in receiving proper treatment guarantees the trustworthiness of the statements," and consequently, hearsay statements disclosing the identity of a sexual abuser are admissible under Rule 803(4) only "where the physician makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding." *United States v. Renville*, 779 F.2d 430, 438 (8th Cir. 1985). We have asked two questions in determining whether a statement meets the standards for admission under Rule 803(4): "first, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by

a physician in treatment or diagnosis." *Id.* at 436. We conclude that M.T.B.'s disclosure in the forensic interview of the identity of her abuser and descriptive details of the abuse might be reasonably relied on by a physician in treating and diagnosing any trauma resulting from that abuse, but that there was insufficient evidence in the record that M.T.B. had the requisite motive in making the statements.

Even though Ms. Brazil's interview was tangentially related to a doctor's physical examination, we think that the government has failed to establish that M.T.B.'s frame of mind at the time of Ms. Brazil's interview was that of a patient seeking medical treatment. There is simply no evidence that M.T.B., who was three years and ten months old at the time of the interview, understood the medical significance of being truthful in discussing the details of the alleged abuse with Ms. Brazil, and that she thus had the selfish subjective motive of receiving proper treatment. *See Sumner*, 204 F.3d at 1185-86.

Ms. Brazil testified that the doctor informed M.T.B. before the interview that she was "there for a checkup" and that Ms. Brazil's job was to "take a history" for her or to "kind of find out how things are" for her before she had her checkup. There is, however, no evidence that M.T.B. was aware that she had an injury or that she understood that telling the truth was important to the treatment for that injury. Ms. Brazil did not discuss why the questions she asked were important to the diagnosis and treatment and why it was important for M.T.B. to tell the truth regarding the details of any abuse or the identity of any abuser. *See id.* To the contrary, Ms. Brazil testified that when she spoke to M.T.B., she did not delve into the distinction between telling the truth and lying because of M.T.B.'s young age. We recognize that in situations involving very young declarants, it may be exceedingly difficult to establish the existence of a selfish motive for receiving proper treatment, but that is what the applicable principles require.

Because we conclude that M.T.B.'s out-of-court videotaped statements do not fall within a firmly rooted hearsay exception, we must determine whether they nevertheless exhibit "particularized guarantees of trustworthiness" to overcome a confrontation clause objection to their admission. The relevant circumstances with regard to a showing of particularized guarantees of trustworthiness "include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright*, 497 U.S. at 819. The evidence must be "at least as reliable as evidence admitted under a firmly rooted hearsay exception" and "so trustworthy that adversarial testing would add little to its reliability." *Id.* at 821. "[U]nless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Id.* Evidence corroborating the truth of a hearsay statement may not be used to support a finding that the statement bears particularized guarantees of trustworthiness. *Id.* at 822. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.*

In admitting the hearsay videotape, the district court relied, in part, on the fact that other evidence conflicted with the videotape, stating that "[t]he testimony [at trial] of the two children was not consistent with statements previously made by the children in the videotaped interviews." But surely a finding that hearsay evidence is inconsistent with evidence admitted at trial does not help bolster the case that the hearsay was inherently trustworthy. The district court did find that the videotaped interviews "apparently, were conducted under the appropriate safeguards as established by various professional bodies," though it did not elaborate on what these safeguards were. Other than this, however, the district court made no findings relating to circumstantial guarantees of trustworthiness before it admitted the videotape and played it for the jury. The district court did make supplemental

findings relating to the reliability of the statements on the videotape after the jury had watched it. Specifically, the court stated that it believed that M.T.B. understood that it was important that she tell the truth, that the interview had been conducted soon after the alleged abuse had been reported, that the questions posed "were open-ended for the most part" with no indication of coaching or suggestive procedures used to obtain the statements, that M.T.B. appeared to be spontaneous and relaxed during the course of the interviews, and that M.T.B. used "somewhat age appropriate language."

Our independent review of the record leads us to conclude that the circumstances rehearsed by the district court are insufficient to justify its conclusion that the hearsay was sufficiently trustworthy. While the district court based its conclusion that the videotaped interview was reliable in part on the fact that the interview occurred "almost immediately after the alleged sexual abuse had been reported," the interview actually occurred over two months after the alleged abuse had been reported and over two years after the date that the indictment alleged that the abuse began. The district court's observation that M.T.B. appeared to be "spontaneous and relaxed" is tempered by the facts shown on the videotape that M.T.B. was initially crying and reluctant to enter the interview room, and that, before responding to questions put to her by Ms. Brazil, M.T.B. looked back to caseworker JoAnn Yankton, who was present throughout the course of the interview. The district court's finding that M.T.B. used "somewhat age appropriate language" does not, we think, count for much, as the language was found to be only "somewhat" age appropriate, and we have noted in the past that "the fact that [a child] used terminology typical of a child her age is not particularly helpful" in conducting the *Wright* trustworthiness inquiry, *Ring v. Erickson*, 983 F.2d 818, 821 (8th Cir. 1992). Finally, as noted above, nothing unique about the circumstances of the interview indicates that M.T.B. had a particularly strong motivation to tell the truth, since there is no evidence that she understood the medical significance of being truthful in the interview, and Ms. Brazil testified at trial that when she interviewed M.T.B., she

"didn't cover the difference between a truth and lie because with children under four often I won't do that just because they're so young."

While we can discern nothing about the interview indicating that it is particularly unreliable or untrustworthy, we see no "affirmative reason" suggesting that the hearsay is "so trustworthy that adversarial testing would add little to its reliability." There is a longstanding presumption in the law that hearsay statements are not worthy of reliance at trial. The district court's findings are insufficient to rebut this presumption, and because Mr. Turning Bear never had a constitutionally adequate opportunity to confront his accuser at trial, the confrontation clause required exclusion of the hearsay videotape.

IV.

We have concluded that the district court violated Mr. Turning Bear's right to present witnesses in his defense by excluding Ms. Odens's opinion testimony for improper reasons, and that it violated his right of confrontation by allowing M.T.B. to testify by closed-circuit television and by admitting the videotape of M.T.B.'s out-of-court statements to a forensic interviewer. Mr. Turning Bear is not entitled to relief, however, if these errors were "so unimportant and insignificant that they may ... be deemed harmless." *Chapman v. California*, 386 U.S. 18, 22 (1967). Under *Chapman*, the district court's errors were harmless only if it is clear beyond a reasonable doubt that they did not contribute to the jury's guilty verdict. *Id.* at 24. " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Id.* at 23 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)). The proper inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

-15-

The jury convicted Mr. Turning Bear on five separate offenses: two counts of unlawful sexual contact with N.T.B. and three counts of unlawful sexual contact with M.T.B. We must determine whether it is clear beyond a reasonable doubt that the three evidentiary errors did not contribute to the jury's guilty verdict on any of these five counts. In analyzing the evidence for harmless error, M.T.B.'s closed-circuit television testimony "must be entirely excluded because it would be 'pure speculation' to consider whether the child's testimony, or the jury's assessment of that testimony, would have changed had there been proper confrontation." *Hoversten*, 998 F.2d at 617 (quoting *Coy*, 487 U.S. at 1022). Similarly, in analyzing the evidence, we must entirely exclude the videotaped interview and include Ms. Odens's proffered opinion testimony.

We thus must determine whether inclusion of M.T.B.'s closed-circuit television testimony and hearsay videotape and exclusion of Ms. Odens's opinion testimony about N.T.B.'s untruthfulness contributed nothing to the jury's guilty verdict on any of the five counts beyond a reasonable doubt. If the evidence of guilt actually presented to the jury, not including M.T.B.'s closed-circuit television testimony or her videotaped statements to the forensic interviewer, was "overwhelming" as to any of the counts, then it is likely that the evidentiary errors were harmless with regard to those counts. *See, e.g. United States v. Oliver*, 492 F.2d 943, 947 (8th Cir. 1974) (quoting *Harrington v. California*, 395 U.S. 250, 254 (1969)).

Excluding M.T.B.'s closed-circuit television testimony and videotaped interview, the government's remaining evidence was scant with regard to the counts involving the alleged abuse of M.T.B. There was some evidence discovered in a medical examination of M.T.B. that was consistent with physical abuse, but it did not conclusively establish that M.T.B. had been physically abused or provide any information about the identity of the abuser, if any. As the district court found, the medical evidence did "somewhat backup the alleged abuse" of M.T.B. During N.T.B.'s videotaped forensic interview, which was introduced into evidence, he

-16-

described sexual contact by Mr. Turning Bear against M.T.B. At trial, however, N.T.B. denied seeing Mr. Turning Bear abusing his sister, but testified that he himself had sexually touched M.T.B., and that other minors had sexually touched M.T.B.

The doctor who physically examined M.T.B. and N.T.B., considering a range of behaviors attributed by others to the two children, expressed the opinion "[t]hat those behaviors could be consistent with child sexual abuse," but that they also might be explained by other trauma. M.T.B. and N.T.B. had earlier been in an automobile accident in which their mother and grandmother had been killed in the children's presence, and the doctor testified that trauma from such an event was of the sort that might cause the kind of abnormal behavior exhibited by the children.

M.T.B.'s statements to the forensic interviewer and during the closed-circuit testimony were clearly important evidence in the government's case against Mr. Turning Bear in the three counts relating to the alleged abuse of M.T.B., and we believe that the statements very likely contributed to his conviction on these three counts. We certainly cannot conclude beyond a reasonable doubt that the jury did not give any weight to M.T.B.'s closed-circuit television testimony or her videotaped interview in returning guilty verdicts on these counts.

The harmless error inquiry with regard to the two counts involving N.T.B. is not as clear-cut. There was no physical evidence relating to the counts involving the alleged abuse of N.T.B. In his videotaped interview that was played for the jury, N.T.B. described sexual contact by his father against himself, saying at first that it happened just "once," and then reversing himself to say that it happened "lots of times." N.T.B. testified at trial, at first denying sexual contact by his father, but eventually indicating that he had been abused between twenty and thirty times. He also testified at trial that his father had punched him in the back "[p]robably every day." Mr. Turning Bear was allowed broad inquiry on cross-examination of N.T.B. Considering the record as a whole, testimony by a foster parent in whose custody

N.T.B. was placed for a period of several months that she held an opinion that he was untruthful would likely not have been the most significant or probative evidence presented. N.T.B. was, however, the key government witness with regard to the counts relating to his alleged abuse, and his credibility was a very important issue. Because the evidence presented against Mr. Turning Bear on the two counts relating to N.T.B. was not "overwhelming," we cannot say that the opinion evidence itself, had it been admitted, would have counted for nothing in the jury's verdict beyond a reasonable doubt. We thus conclude that there is a reasonable possibility that the three evidentiary errors complained of contributed to the jury's conviction on each of the five counts.

## V.

Mr. Turning Bear also argues that the district court misapplied the United States Sentencing Guidelines in calculating his sentence. Because we have concluded that constitutional errors were committed during the course of Mr. Turning Bear's trial, and that those errors were not harmless, the challenge to the computation of his sentence is moot.

Reversed and remanded.

_____