The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 29, 2025

**2025COA53**

**No. 22CA1175, *People in Interest of A.T.S.* — Constitutional Law — Sixth Amendment — Confrontation Clause; Trials — Use of Closed-Circuit Television — Presence of the Defendant**

A division of the court of appeals addresses when a child witness may testify via closed-circuit television in a criminal case. The division holds that a child witness may testify by closed-circuit television only if the trial court finds, among other factors, that the child would suffer serious emotional distress or be traumatized by the presence of the defendant in the courtroom.  *See Maryland v. Craig*, 497 U.S. 836, 856 (1990).  While the child may have various fears about testifying, the presence of the defendant must be "the dominant reason" preventing the child from testifying in open court. *United States v. Bordeaux*, 400 F.3d 548, 555 (8th Cir. 2005).

In this case, the juvenile court found that the presence of the defendant's parents, not the defendant himself, was the dominant

reason that the child victim could not testify in open court. Thus, the division concludes that the court erred by permitting the victim to testify via closed-circuit television. Nevertheless, after reviewing the record, the division determines that this error was constitutionally harmless.

Because the division also rejects the defendant's other contentions regarding prosecutorial misconduct and sufficiency of the evidence, it affirms the juvenile court's judgment.

COLORADO COURT OF APPEALS                                    **2025COA53**

Court of Appeals No. 22CA1175
City and County of Denver Juvenile Court No. 21JD94
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.T.S.,

Juvenile-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE YUN
J. Jones and Brown, JJ., concur

Announced May 29, 2025

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney
General, Gina M. Nykerk, Assistant Attorney General Fellow, Denver, Colorado,
for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Mark Evans, Deputy State
Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1     A.T.S. appeals his adjudication for sexual assault on a child. He contends that (1) the juvenile court reversibly erred by allowing the victim to testify by closed-circuit television; (2) the prosecutor engaged in misconduct during closing argument; and (3) there was insufficient evidence that an act occurred after A.T.S. turned ten years old.  We reject these arguments and affirm the judgment.

¶ 2     In addressing A.T.S.'s contentions, we confront a novel issue in Colorado: Can a juvenile court permit a child witness to testify via closed-circuit television primarily because the child would be traumatized by the presence of the defendant's family?  We hold that it cannot.  A child witness may testify by closed-circuit television only if the trial court finds, among other factors, that the child would be traumatized by the presence of the defendant in the courtroom.  *Maryland v. Craig*, 497 U.S. 836, 856 (1990).  While the child may have various fears about testifying, the presence of the defendant must be "the dominant reason" preventing the child from testifying in open court.  *United States v. Bordeaux*, 400 F.3d 548, 555 (8th Cir. 2005).

¶ 3     Because the juvenile court found that A.T.S.'s presence was not the dominant reason that the victim could not testify in open

1

court, we conclude that it erred by permitting the victim to testify via closed-circuit television. However, after reviewing the record, we determine that this error was constitutionally harmless.

## I.     Background

¶ 4     When the victim was nine years old, he disclosed to his mother that A.T.S., his older cousin on the paternal side of the family, had sexually molested him. In a forensic interview, the victim described anal-genital, oral-genital, and manual-genital contact that occurred when he was between the ages of four and seven and A.T.S. was between the ages of ten and thirteen. The victim said that A.T.S. had told him the abuse would make him stronger but that, when he was five or six, he "noticed [he] wasn't getting strong" and told A.T.S. to stop. He said he told his mother because he had been "hiding it for four or five years" and did not "want it [to be] a secret" any longer.

¶ 5     The People filed a petition in delinquency charging A.T.S. with one count of sexual assault on a child. A jury found him guilty as charged, and the juvenile court sentenced him to two years of probation.

## II.     Testimony By Closed-Circuit Television

¶ 6      A.T.S. contends that the juvenile court violated his confrontation rights by permitting the victim to testify by closed-circuit television.  We agree that the court erred, but we conclude that the error was harmless beyond a reasonable doubt.

### A.     Additional Background

¶ 7      Before trial, the People moved to allow the victim to testify by closed-circuit television, explaining that the victim's mother had "indicated that testifying in front of his cousin and his cousin's parents, namely his aunt and uncle, could cause [the victim] to suffer serious emotional distress."  A.T.S. objected.  In support of their motion, the People submitted an affidavit from the victim's therapist, who said that she had become

> very familiar with the dynamics of [the victim's] paternal family, including relationships with aunts, uncles, cousins, and grandparents.  In working with [the victim], it is my observation that [the victim] struggled with the power and control dynamics present in his relationships with those family members.  I further observed that, due to those power and control dynamics, [the victim] struggled to advocate for himself with that side of the family.

Accordingly, she expressed her "clinical opinion . . . that [the victim's] testifying in a courtroom directly in front of his paternal cousin, aunt, and uncle would cause [the victim] to experience trauma, and that that trauma is very likely to inhibit [the victim's] ability to communicate in court."

¶ 8 After a hearing, the court found that, "based on the forensic interview that I've seen, the child hearsay hearing that I had, and the statements in the [therapist's] affidavit, I am much less worried about . . . the [victim] being in the same room with [A.T.S.] than I am with the influence of [A.T.S.'s] parents and their relationship to the [victim]." It then determined "that testimony by the [victim] in the courtroom in the presence of [A.T.S.], and [A.T.S.'s] parents, . . . would result in the [victim] suffering serious emotional distress or trauma, such that the [victim] would not be able to reasonably . . . communicate."

¶ 9 At trial, the victim testified briefly by closed-circuit television. Although A.T.S. observed the testimony from the courtroom, his counsel was in the same room as the victim and had the opportunity to cross-examine him. Afterward, the court instructed the jury that it should assess the victim's credibility without putting

4

"any special weight on the fact that [the victim] testified outside of the courtroom." It reiterated that message in the final jury instructions.

### B. Governing Law and Standard of Review

¶ 10    A defendant has both a federal and a state constitutional right to confront adverse witnesses at trial. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16. But neither the federal nor the state constitution requires that a defendant be allowed in all instances to confront an adverse witness face-to-face in court. *People v. Phillips*, 2012 COA 176, ¶¶ 49-59.

¶ 11    In *Craig*, the United States Supreme Court upheld a defendant's sexual assault convictions even though the victims had testified outside her presence via closed-circuit television. The Supreme Court reasoned that the Constitution's "preference" for face-to-face confrontation "must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 848-49 (quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895)).

¶ 12    In further elaborating on *Craig*, a division of this court noted that

> [i]n *Craig*, the Court recognized that a state's interest in protecting the physical and psychological well-being of child abuse victims could, in some cases, be sufficiently important to outweigh a defendant's right to face his or her accusers in court. Such a case is presented when the trial court finds that (1) a special procedure is necessary to protect the welfare of the particular child witness; (2) the particular child witness would be traumatized by the presence of the defendant — not by the proceedings generally; and (3) the child witness will suffer more than de minimis emotional distress if forced to testify in the presence of the defendant.

*People v. Ujaama*, 2012 COA 36, ¶ 19 (citations omitted).

¶ 13    In Colorado, section 16-10-402(1)(a)(II), C.R.S. 2024, authorizes the use of closed-circuit television to obtain the testimony of a child who "at the time of a trial is . . . less than twelve years of age" when "[t]he judge determines that testimony by the witness in the courtroom and in the presence of the defendant would result in the witness suffering serious emotional distress or trauma such that the witness would not be able to reasonably communicate." *See Ujaama*, ¶ 20. "We must interpret a statute in a constitutional manner so long as that construction is consistent with the legislative intent." *Warren v. S. Colo. Excavators*, 862 P.2d 966, 968 (Colo. App. 1993). Accordingly, we interpret section

6

16-10-402 to require a finding, consistent with *Craig*, that the child witness would suffer serious emotional distress or be traumatized primarily "by the presence of the defendant" and "not by the courtroom generally" or by other factors. 497 U.S. at 856; *see also People v. Collins*, 2021 COA 18, ¶ 37 ("The Colorado Constitution secures identical rights as the federal right to confrontation.").

¶ 14    We review de novo whether the juvenile court's decision permitting a witness to testify using closed-circuit television violated a defendant's confrontation rights. *See Phillips*, ¶ 85. "Confrontation Clause violations are trial errors subject to constitutional harmless error review." *Id.* at ¶ 93. If the court erred, we must reverse unless we are persuaded that the error was harmless beyond a reasonable doubt. *People v. Rodriguez*, 209 P.3d 1151, 1158 (Colo. App. 2008), *aff'd*, 238 P.3d 1283 (Colo. 2010). An error "is harmless beyond a reasonable doubt 'if there is no reasonable possibility that it affected the guilty verdict.'" *Id.* (citation omitted).

¶ 15    A.T.S. argues that the juvenile court erred by "focusing on the impact of testifying in front of A.T.S.'s family, rather than A.T.S." himself.  We agree.

¶ 16    To justify testimony by closed-circuit television, the juvenile court must "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Craig*, 497 U.S. at 856.  "Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma."  *Id.*; *see* § 16-10-402(1)(a)(II) (requiring the judge to determine that testifying "in the courtroom *and in the presence of the defendant*" would cause the child witness serious emotional distress) (emphasis added).

¶ 17    Here, the juvenile court explicitly found that its primary concern was "with the influence of [A.T.S.'s] parents" on the victim and that it was "much less worried about . . . the [victim] being in the same room with [A.T.S.]"  Under *Craig* and section 16-10-402(1)(a), this finding was insufficient to permit the victim to

testify by closed-circuit television.[1]  *See United States v.*

*Cotto-Flores*, 970 F.3d 17, 43, 47 (1st Cir. 2020) (district court's

finding that a witness was afraid of testifying generally, rather than

afraid of testifying "in the defendant's presence," was insufficient to

justify testimony by closed-circuit television); *Bordeaux*, 400 F.3d at

555 (district court's finding that a witness's fear of the defendant

was "only one reason why she could not testify in open court,"

rather than "the dominant reason," was insufficient to justify

testimony by closed-circuit television); *United States v. Turning*

*Bear*, 357 F.3d 730, 736-37 (8th Cir. 2004) (district court's finding

that a witness was afraid "of a 'combination' of the presence of [the

defendant], the jury, and the prosecutor, as well as intimidation

from being in the 'very large courtroom,'" was insufficient to justify

testimony by closed-circuit television); *State v. Bray*, 535 S.E.2d

---

[1] During oral argument, the People argued for the first time that
A.T.S.'s father could be considered a "defendant" under section
16-10-402, C.R.S. 2024, because he was named as a respondent in
the petition in delinquency.  We do not consider an argument raised
for the first time during oral argument.  *McGihon v. Cave*, 2016 COA
78, ¶ 10 n.1.  Nor do the People provide any legal authority to
support the proposition that a parent named as a respondent
pursuant to section 19-2.5-502, C.R.S. 2024, can be considered a
defendant under section 16-10-402.  *See People v. Stone*, 2021 COA
104, ¶ 52 (appellate courts do not address undeveloped arguments).

636, 640 (S.C. 2000) (trial court's findings referencing "the victim's young age and fear of [testifying in front of] other family members who did not believe her" were insufficient to justify testimony by closed-circuit television). Rather, *Craig* and section 16-10-402(1)(a) require a finding that "the child witness will in fact be traumatized, not merely by testifying in a courtroom, or in front of a crowd of people or relatives, but by the presence of the particular defendant." *Bray*, 535 S.E.2d at 641. Because the defendant's presence must be "the dominant reason" that the child cannot testify in the courtroom, *Bordeaux*, 400 F.3d at 555, we conclude that the district court erred by allowing the victim to testify by closed-circuit television in this case.

¶ 18    Having concluded that the district court erred, we turn to the question of constitutional harmlessness. "The inquiry in a harmless error analysis is 'whether the guilty verdict actually rendered in this trial was surely unattributable to the error,' and 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered.'" *Phillips*, ¶ 93 (quoting *People v. Fry*, 92 P.3d 970, 980 (Colo. 2004)). In analyzing the evidence for constitutional harmless error, we disregard the

10

improper closed-circuit television testimony. *See Turning Bear*,
357 F.3d at 741 ("[Improper] closed-circuit television testimony
'must be entirely excluded because it would be "pure speculation"
to consider whether the child's testimony, or the jury's assessment
of that testimony, would have changed had there been proper
confrontation.'" (quoting *Hoversten v. Iowa*, 998 F.2d 614, 617 (8th
Cir. 1993))); *Cotto-Flores*, 970 F.3d at 47 (same). Instead, we
consider factors including

> (1) the importance of the declarant's statement
> to the prosecution's case; (2) whether the
> statement was cumulative; (3) the presence or
> absence of corroborating or contradictory
> evidence on the material points of the witness's
> testimony; (4) the extent of the cross-
> examination otherwise permitted; [and] (5) the
> overall strength of the prosecution's case.

*Phillips*, ¶ 93 (quoting *Arteaga-Lansaw v. People*, 159 P.3d 107, 110
(Colo. 2007)).

¶ 19     Applying these factors in this case, we conclude that the error
was constitutionally harmless. The victim's trial testimony was
quite brief, accounting for fewer than twenty pages of transcript. It
was also cumulative of the significantly more detailed statements
the victim made in his video-recorded forensic interview, which was

11

played for the jury.[2]  And defense counsel was in the same room as the victim and had the opportunity to cross-examine him about the relevant events and the forensic interview.  Overall, the prosecution's case was not overwhelming, as it relied on a nine-year-old recalling events that occurred years earlier.  There was no physical evidence, and there were no other witnesses to the abuse.  But the most compelling evidence of A.T.S.'s guilt was the victim's forensic interview and the testimony of other witnesses who interacted with the victim following his outcry.  Accordingly, because the victim's improper trial testimony revealed little about the abuse and was cumulative of the forensic interview, we are

---

[2] As defense counsel acknowledged at oral argument, A.T.S. did not contest the admissibility of the video-recorded forensic interview in his appellate briefs.  In ruling that the victim's statements to the forensic interviewer were admissible, the juvenile court noted that "the [c]ourt does find that the [victim] is available to testify and therefore [A.T.S.'s] confrontation clause [rights] will be protected."  *See People v. Argomaniz-Ramirez*, 102 P.3d 1015, 1018 (Colo. 2004) ("Because the hearsay declarants will testify at trial and will be subject to cross-examination, admission of their out-of-court statements does not violate the Confrontation Clause."); § 13-25-129(5)(b)(I), C.R.S. 2024.  But A.T.S. did not argue that, because we must disregard the victim's trial testimony for purposes of our harmless error analysis, we must also disregard the forensic interview.  Accordingly, we consider the forensic interview in assessing the strength of the evidence of guilt and the impact, or lack thereof, of the confrontation error.

confident that it "contributed nothing to the jury's guilty verdict."
*Turning Bear*, 357 F.3d at 741.

¶ 20    We thus conclude that the district court's error in permitting the victim to testify by closed-circuit television based primarily on his fear of A.T.S.'s family was harmless beyond a reasonable doubt.

### III.    Prosecutorial Misconduct

¶ 21    Next, A.T.S. contends that the prosecutor committed misconduct during closing argument.  We conclude that no plain error occurred.

### A.    Additional Background

¶ 22    A generalized expert in child sexual assault dynamics testified at trial.  During cross-examination, defense counsel asked about the expert's experience with false allegations, and the following exchange occurred:

> [DEFENSE COUNSEL:] So your role as a therapist, as we discussed before, is to treat the child; is that right?
>
> [EXPERT:] Yes.
>
> [DEFENSE COUNSEL:] And [for] the vast majority of the children with [whom] you work, there has already been some sort of determination that they were a victim of sexual abuse?

13

[EXPERT:] That is correct.

[DEFENSE COUNSEL:] And if it turns out that an accused is later found innocent of the accusation, you don't go back and re-analyze your opinion to see if you got it wrong?

[EXPERT:] No. I'm not making that determination at the front end. I'm not determining if it's founded or not founded.

[DEFENSE COUNSEL:] So if a child later admitted to lying or — not recanting, but actually lying about the accusation, you don't change your opinion regarding that child as a victim of sexual abuse?

[EXPERT:] That hasn't happened.

[DEFENSE COUNSEL:] That's never happened?

[EXPERT:] That's not happened in my experience in my work, no. . . . [T]he children that I've worked with around sexual abuse, there has been an investigation, there has been a determination made. So I don't screen children. If someone calls me and says, I'm concerned my child has been sexually abused, I refer them to an investigation team. I don't see them to screen that out. . . .

[DEFENSE COUNSEL:] So you've never had a child admit to false allegations?

[EXPERT:] That is correct.

14

¶ 23     During closing argument, the prosecutor reviewed the evidence supporting the victim's credibility.  In doing so, she made the following reference to the expert's testimony:

> And I will mention something interesting that [the expert] said.  She was asked on cross, you know, how many times has a kid come forward and said, Oh, I was lying.  I was lying.  I made it up, something to that effect.  What did she say?  In her decades of experience, that just hasn't happened.  That just doesn't happen.

¶ 24     Defense counsel did not object.

### B.     Governing Law and Standard of Review

¶ 25     We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 26     First, we determine whether the conduct was improper based on the totality of the circumstances.  *Id.*  We consider the context of the argument as a whole and view it in light of the evidence before the jury.  *People v. Samson*, 2012 COA 167, ¶ 30.  "A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts."  *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010).  The prosecutor may also "employ rhetorical devices and engage in oratorical

embellishment." *Samson*, ¶ 31. Because arguments delivered in the heat of trial are not always perfectly scripted, we give the prosecutor the benefit of the doubt when her remarks are "ambiguous or simply inartful." *Id.* at ¶ 30. But the prosecutor may not misstate the evidence or the law. *Id.* at ¶ 32; *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005).

¶ 27     Next, if we identify misconduct, then we determine whether it warrants reversal under the applicable standard. *Wend*, 235 P.3d at 1096. We review unpreserved claims of prosecutorial misconduct for plain error. *People v. Licona-Ortega*, 2022 COA 27, ¶ 86. To meet this standard, the conduct must be "flagrantly, glaringly, or tremendously improper" and "so undermine[] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (first quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997); and then citing *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)). "Prosecutorial misconduct in closing argument rarely constitutes plain error." *Weinreich*, 98 P.3d at 924.

16

## C.    Discussion

¶ 28    The prosecutor characterized the expert's cross-examination testimony regarding children admitting to having made false accusations of abuse as follows: "In her decades of experience, that just hasn't happened.  That just doesn't happen."  While A.T.S. does not dispute that the first sentence was an accurate statement of the expert's testimony, he argues that the second sentence was improper because it equated something that had not happened *in the expert's experience* with something that does not happen *at all.* By saying "[t]hat just doesn't happen," he argues, the prosecutor vouched for the victim's credibility and implied that the People had secret information "confirming children never lie about sexual assault."  We are not persuaded.

¶ 29    While the prosecutor's statement that "[t]hat just doesn't happen" may have been inartful, it was, in context, a clear reference to her prior accurate statement of the expert's testimony.  *See Samson*, ¶ 30.  The prosecutor simply highlighted the expert's observation that she had never worked with a child who admitted to making a false allegation.  In doing so, the prosecutor did not state or imply a personal belief in the credibility of the victim's allegation.

17

Indeed, moments before making the challenged statement, she reminded the jury that determining the credibility of witnesses was "up to you and you alone."

¶ 30    Nor did the prosector imply that the People had access to additional information beyond that presented at trial.  Rather, she began by referencing the expert by name and mentioning a specific part of her trial testimony, inviting the jury to recall "something interesting that [the expert] said."  To the extent the prosecutor's statement that "[t]hat just doesn't happen" was imprecise, it did not stray so far from the expert's testimony as to indicate to the jury that the prosecutor was relying on something other than the evidence offered at trial.

¶ 31    Further, even if the prosecutor misstated the expert's testimony, we conclude that her single improper statement does not warrant the drastic remedy of reversal under the plain error standard.  *See Domingo-Gomez*, 125 P.3d at 1053 ("Comments that were 'few in number, momentary in length, and were a very small part of a rather prosaic summation' do not warrant reversal under the plain error standard." (quoting *People v. Mason*, 643 P.2d 745, 753 (Colo. 1982))).  Any misstatement was immediately preceded by

18

an accurate statement of the expert's testimony and, therefore, was not "flagrantly, glaringly, or tremendously improper." *Id.* (quoting *Avila*, 944 P.2d at 676).

¶ 32    We thus conclude that no plain error occurred.

### IV.    Sufficiency of the Evidence

¶ 33    Finally, A.T.S. contends that there was insufficient evidence that an act occurred within the date range alleged in the delinquency petition and after A.T.S. turned ten years old, the age at which he became subject to the juvenile court's jurisdiction.  We are not persuaded.

### A.    Additional Background

¶ 34    A.T.S. was born on March 13, 2005.  The victim was born on January 17, 2012.  The People charged A.T.S. with acts occurring "[b]etween and including approximately January 17, 2016 and January 17, 2019" — that is, when the victim was between the ages of four and seven and when A.T.S. was between the ages of ten and thirteen.

¶ 35    The victim, who was nine years old at the time of his outcry, made conflicting statements about when exactly the abuse occurred.  He said in his forensic interview that it was "four or five

19

years ago" — that is, when he was five or four years old. He also said that he finally told A.T.S. to stop when he was five or six. At trial, he testified that he was "4 or 5 or 3." In both his forensic interview and his trial testimony, he said that the abuse occurred before the birth of his little sister. The sister was born on December 6, 2015, when the victim was three years and ten and a half months old and when A.T.S. was ten years and nine months old.

¶ 36    At the close of evidence, A.T.S. moved for a judgment of acquittal, arguing that the evidence was insufficient for the jury to find that an act occurred after A.T.S turned ten. In response, the court observed that (1) A.T.S. turned ten on March 13, 2015, and the sister was born on December 6, 2015, so there were several months before the sister's birth when A.T.S. was over the age of ten; and (2) there was also evidence that the victim told A.T.S. to stop when he was six years old, which would have made A.T.S. twelve or thirteen. Accordingly, the court denied the motion.

¶ 37    The court instructed the jury as follows:

> [A.T.S.] has been charged with committing a
> delinquent act between approximately
> 01/17/2016 and 01/17/2019 but not before

03/13/2015. You are instructed that you must unanimously agree, beyond a reasonable doubt that the sexual act occurred during this time period for the charge of Sexual Assault on a Child.

The Juvenile Court has jurisdiction over children between the age of 10 years old until a child turns 18 years old. This jurisdiction is based on the date of the alleged offense and not the age of the child at the time of the trial. If you find the sexual act occurred prior to [A.T.S.'s] 10th birthday, 03/13/2015, you must find [A.T.S.] not guilty of Sexual Assault on a Child.

B. Governing Law and Standard of Review

¶ 38    "Subject matter jurisdiction concerns a court's authority to hear and rule on a certain class of cases and is conferred by the state constitution and statutes." *People In Interest of P.K.*, 2015 COA 121, ¶ 9. "If a court does not have subject matter jurisdiction, it is deprived of any authority to act from the outset of the case." *Id.*

¶ 39    "In Colorado, the juvenile court is a creature of statute, and the statutory language establishing the scope of its jurisdiction necessarily delimits that jurisdiction." *Id.* at ¶ 10 (footnote omitted). Except as otherwise provided by law, section 19-2.5-103(1)(a), C.R.S. 2024, confers exclusive jurisdiction on the juvenile court

21

over cases concerning juveniles between ten and eighteen years of age. "In assessing the jurisdiction of the juvenile court, the relevant inquiry is the age at which the alleged acts were committed, not the age at which a disposition was imposed." *P.K.*, ¶ 10.

¶ 40 In juvenile cases, "a delinquency petition is the equivalent of a complaint and information." *Id.* at ¶ 11. A petition therefore must "advise the juvenile of the nature and cause of the accusation" against them and "assert details concerning the jurisdiction of the juvenile court." *Id.*; *see* § 19-2.5-502(4), C.R.S. 2024.

¶ 41 "A simple variance occurs when the charged elements are unchanged, but the evidence proves facts materially different from those alleged in the charging instrument." *People v. Rice*, 198 P.3d 1241, 1245 (Colo. App. 2008). Generally, a simple variance does not require reversal. *Id.* "However, a variance between the specific date of the offense as alleged in the information and the date as proved at trial is reversible error if the defendant's ability to defend against the charge was impaired." *People v. Lopez*, 140 P.3d 106, 109 (Colo. App. 2005).

¶ 42 We review challenges to subject matter jurisdiction de novo. *P.K.,* ¶ 8. We also review de novo whether a variance occurred.

*People v. Rail*, 2016 COA 24, ¶ 48, *aff'd on other grounds*, 2019 CO 99, *and abrogated by Bock v. People*, 2024 CO 61.  Finally, we review sufficiency of the evidence challenges de novo.  *McCoy v. People*, 2019 CO 44, ¶ 34.  In doing so, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."  *Id.* at ¶ 63 (citation omitted).

## C.    Discussion

¶ 43     A.T.S. argues that, because the victim testified that the abuse occurred before his sister was born on December 6, 2015, "it necessarily occurred before the time charged by the State," which began the following month on "approximately January 17, 2016." He thus argues that a variance occurred and that it requires reversal because it impaired A.T.S.'s ability to defend against the charge.  He furthers argues that, "[m]ore critically," the evidence was insufficient to support the jury's finding that the abuse occurred after A.T.S. turned ten.

¶ 44  But while A.T.S. argues that the evidence could support only one conclusion — "that the abuse had to have occurred before December 6, 2015," when the victim was three years old — the evidence was not as straightforward as A.T.S. suggests. The victim also said that the abuse occurred "four or five years ago," when he was five or four years old, and that he told A.T.S. to stop when he was five or six. All three of these later dates — when the victim was four, five, or six years old — fall within the charged timeframe, which began when the victim turned four and ended when he turned seven. Because there was evidence from which the jury could find that the abuse occurred within the charged timeframe, we are not convinced that a variance occurred. But even to the extent there was a discrepancy between the dates alleged in the petition and the victim's trial testimony about the abuse occurring before his sister was born, the evidence at trial could not have taken the defense by surprise because the victim shared the same information in his forensic interview. The evidence at trial thus did not force A.T.S. to defend against anything new or unknown.

¶ 45  Further, the evidence that the abuse occurred within the charged timeframe also supports the jury's finding that it occurred

24

after A.T.S. turned ten.  Indeed, as the juvenile court noted in ruling on A.T.S.'s motion for a judgment of acquittal, the victim's testimony that the abuse took place before his sister was born did not contradict a finding that it happened after A.T.S. turned ten, as A.T.S.'s tenth birthday (on March 13, 2015) fell several months before the sister was born (on December 6, 2015).

¶ 46    "It is the fact finder's role to weigh the credibility of witnesses, to determine the weight to give all parts of the evidence, and to resolve conflicts, inconsistencies, and disputes in the evidence." *People v. Poe*, 2012 COA 166, ¶ 14.  Accordingly, determinations on issues of credibility and weight will not be disturbed on appeal unless the evidence is legally insufficient to support a finding of guilt beyond a reasonable doubt.  *People v. Padilla*, 113 P.3d 1260, 1261 (Colo. App. 2005).  "The jury, not the court, must perform the fact-finding function when conflicting evidence — and conflicting reasonable inferences — are presented," and, therefore, in a sufficiency of the evidence inquiry, an appellate court "must not invade the province of the jury by second-guessing its conclusion when the record supports the jury's findings." *People v. Perez*, 2016 CO 12, ¶ 31.  Because there is sufficient evidence in the record to

support the jury's finding that an act occurred after A.T.S. turned ten, we will not disturb its determination on appeal.

## V. Disposition

¶ 47    The juvenile court's judgment is affirmed.

JUDGE J. JONES and JUDGE BROWN concur.