HECHT, Justice
(concurring specially).
This appeal presents two essential questions. First, did the State show exceptional circumstances supporting the district court’s ruling that four of the State’s witnesses could testify without being physically present in the courtroom (the “necessity question”)? Second, if exceptional circumstances have been shown, did the State establish the technology it proposed to use would adequately protect Rogerson’s right of confrontation (the “reliability question”)? Although my colleagues suggest they decide only the necessity question in this case, their opinion expresses views about reliability with which I am not prepared to concur. I agree the State made no attempt to show necessity, and I agree the district court’s order should be reversed for that reason. I write separately, however, because I do not share my colleagues’ conclusion that current two-way video technology is inadequate and cannot accomplish the constitutional objectives of confrontation.
The text of the Sixth Amendment does not expressly require confrontation be achieved with testimony by witnesses who are physically present in the courtroom. U.S. Const, amend. VI. The drafters of the Sixth Amendment likely did not contemplate the possibilities presented by present-day technology; they were concerned principally with convictions by affidavit. Mattox v. United States, 156 U.S. 287, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411 (1895) (“The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits ... being used against the prisoner in lieu of personal examination and cross-examination of the witness-”). The notion witnesses should be physically present in the courtroom springs at least in part from courts’ linguistic analysis of the word “confront.” Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666, 678 (1990) (“The word ‘confront,’ after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness.”); Coy v. Iowa, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 2800, 101 L.Ed.2d 857, 864 (1988) (“[T]he word ‘confront’ ultimately derives from the [Latin] prefix ‘con-’ (from ‘contra’ meaning ‘against’ or ‘opposed’) and the noun ‘irons’ (forehead).”); California v. Green, 399 U.S. 149, 175, 90 S.Ct. 1930, 1944, 26 L.Ed.2d 489, 506 (1970) (Harlan, J., concurring) (“Simply as a matter of English the clause may be read to confer ... a right to meet face to face all those who appear and give evidence at trial.”).
Going beyond linguistics, the Supreme Court has concluded a defendant’s Sixth Amendment right of confrontation does not establish an absolute requirement the accuser be physically present in the courtroom when testimony is presented in a criminal case. Craig, 497 U.S. at 853, 110 S.Ct. at 3167, 111 L.Ed.2d at 683. The goal of confrontation — assuring “the reliability of evidence” — can be achieved without an accuser’s physical presence in the courtroom if four conditions are met: (1) the accuser must testify under oath, (2) the defendant must have the opportunity to cross-examine the accuser, (3) the jury must be able to observe the demeanor of the accuser while testimony is given, and (4) the accuser must testify in the presence of the accused. Id. at 845-46, 110 S.Ct. at 3163, 111 L.Ed.2d at 678. Craig established that a youthful accuser’s presence can be accomplished under exceptional cir *509 cumstances consistent with the Confrontation Clause through the use of closed-circuit technology permitting the defendant and fact finder(s) to observe the accuser during her testimony, but not permitting the accuser to see the defendant. Id. at 857, 110 S.Ct. at 3170, 111 L.Ed.2d at 686. As my colleagues recognize, two-way video technology allows the witness and the defendant to see one another. Accordingly, the form of transmission the State proposed to use in this case is “very different from th[e closed-circuit system] used in ... Craig.” See Order of the Supreme Court, 207 F.R.D. 89, 101 (2002) (advisory committee’s note to proposed Fed.R.Crim.P. 26(b), reprinted as an appendix to the statement of Breyer, J.).
Whether a defendant’s right of confrontation is adequately protected when witnesses testify via two-way video technology turns largely, in my view, on fact determinations. I believe that in this case, the question whether the sufficiency of the technology could have been shown should be left completely open. The answer to this question in a future case should be informed in part by the latest social science addressing the extent, if any, to which the actual physical presence of a witness in a courtroom produces a sufficiently enhanced opportunity for confrontation when compared to presence achieved through two-way video technology. Indeed, the answer to this fact question is essential, in my view, to a determination of whether the difference between actual and virtual presence supports the continued maintenance of a strict constitutional distinction.
I, of course, concede my colleagues’ observation that virtual presence is not “the same” as physical presence. However, I believe social science should inform our answer to the question whether existing state-of-the-art technology can achieve the goal of confrontation through an accuser’s virtual presence. If technology has evolved to the point where real-time video testimony neither significantly diminishes the fact finders’ ability to assess credibility nor lessens accusers’ motivation to tell the truth, courts should not cling to old forms for consistency’s sake. I acknowledge some scholars have suggested we simply do not know the answers to these questions. See Richard D. Friedman, Remote Testimony, 35 U. Mich. J.L. Reform 695, 702-03 (2002) (“I do not know of any extant studies that can give substantial comfort on [the effect of remote testimony].”); Nancy Gertner, Videoconferencing: Learning Through Screens, 12 Wm. & Mary Bill Rts. J. 769, 787 (2004) [hereinafter Gertner] (calling “for. more studies of [videoconferencing’s] significance in enabling jurors to evaluate testimony”); Fredric I. Lederer, The Road to the Virtual Courtroom? A Consideration of Today’s — and Tomorrow’s — High-Technology Courtrooms, 50 S.C. L.Rev. 799, 820 (1999) [hereinafter Lederer] (“[W]e lack any experimental evidence that might indicate whether remote witnesses are more or less likely to tell the truth than in-court witnesses.”); Marc Chase McAllister, Two-Way Video Trial Testimony and the Confrontation Clause: .Fashioning a Better Craig Test in Light of Crawford, 34 Fla. St. U.L.Rev. 835, 875 (2007) [hereinafter McAllister] (“[T]he precise effects of virtual confrontation are still unknown.”). Yet, years have passed since those scholars weighed in. The advance of technology continues. More recent social science scholarship bearing on the subject could inform a future decision on these important questions.
My colleagues posit that the “social pressure to tell the truth can be diminished when the witness is far away rather than physically present with the defendant in the courtroom,” and assert “the screen *510 and the physical distance between the [witness and the defendant] tend to reduce the truth-inducing effect of the confrontation.” These intuitive assumptions bearing on the assessment of reliability may be true, but maybe not. Jeremy A. Blumenthal, A Wipe of the Hands, a Lick of the Lips: The Validity of Demeanor Evidence in Assessing Witness Credibility, 72 Neb. L.Rev. 1157, 1173-74 (1993) (asserting the profound effect of confrontation and the difficulty of lying to someone’s face are “accepted, but unfounded” premises). More importantly, however, the majority’s statement of these assumptions suggests— at least implicitly — that my colleagues are addressing more than the necessity question in this case.
I do not presume my colleagues’ assumptions are true or false. I would prefer instead to determine such matters based upon a record revealing the fullness of witnesses’, defendants’, and fact finders’ perceptions permitted by two-way technology utilized or proposed for use in a particular case. Assumptions supporting the requirement of witnesses’ physical presence in the courtroom — and eschewing evidence presented via two-way video technology — should be’ tested against expert opinions from the social sciences on the question whether the purposes of confrontation are in fact significantly advanced by physical presence.[8]
Courts have persisted in viewing witnesses’ physical presence as a core feature of confrontation, but they have offered little more than intuition in support. See, e.g., Craig, 497 U.S. at 846, 110 S.Ct. at 3164, 111 L.Ed.2d at 679 (“[F]ace-to-face confrontation ... reduc[es] the risk that a witness will wrongfully implicate an innocent person.”); Coy, 487 U.S. at 1019, 108 S.Ct. at 2802, 101 L.Ed.2d at 866 (“It is always more difficult to tell a lie about a person ‘to his face’ than ‘behind his back.’ ”); United States v. Bordeaux, 400 F.3d 548, 554 (8th Cir.2005) (relying on “intangible elements” in concluding both that two-way confrontation “is not constitutionally equivalent to a face-to-face confrontation” and that two-way systems “fall short”). I would prefer to have evidence bearing upon several questions before deciding whether virtual presence can satisfy — beyond the limited circumstances present in Craig — the essential purposes of the confrontation right. Does available technology permit the witness and the defendant a sufficient view of each other to achieve the purposes of face-to-face confrontation? Does available technology allow fact finders a sufficient opportunity to hear and see the witness in assessing credibility? [9] Do witnesses sworn to tell the truth really tend to feel a greater motivation for honesty when they are physically present in the courtroom with the defendant than when they are able to see and experience the defendant’s presence on a monitor as they testify via two-way video technology? To what extent do the “trap *511 pings” or symbols of the courtroom tend to emphasize the solemnity of judicial proceedings and increase the likelihood that witnesses will tell the truth when they testify in person? If — as we sometimes assume — there is a correlation between the factors emphasizing the solemnity of the proceedings and witnesses’ motivation toward honesty, should we really believe those factors cannot be effectively communicated to witnesses through currently available two-way video technology?
The State provided no evidence in this case illuminating the court’s answers to these questions. Accordingly, I associate myself — for now — with my colleagues’ conclusion that “[rjemote testimony of any kind should not be lightly substituted” in place of live testimony by witnesses physically present in the courtroom. However, I would not assume or decide without more evidence that effective confrontation cannot be provided in criminal cases through currently available two-way video technology-[10]
Courts must maintain their relevance over time by utilizing emerging technologies consistent with constitutional purposes, rather than steadfastly adhering to the way it used to be. See Harrell v. State, 709 So.2d 1364, 1372 (Fla.1998) (“[Cjourtrooms ... cannot sit idly by, in a cocoon of yesteryear, while society and technology race [forward].”). Although courts have interpreted the Confrontation Clause as requiring in-person testimony except in exceptional circumstances, this interpretation was developed long before technology allowed excellent two-way video transmission. Similarly, although my colleagues allow for the possibility that virtual presence will someday be sufficient for purposes of the Confrontation Clause, they conclude “we are not there yet.” Lacking sufficient information, I am not prepared to join in that conclusion today.
I agree the State did not prove necessity, so the district court’s order must be reversed. However, I would allow for the possibility that, with current technology and reasonable precautions employed by counsel and carefully enforced by courts, virtual presence might permit constitutionally sufficient confrontation.

. Some studies suggest that, “as a general rule, people are poor human lie detectors”— perhaps no matter the medium. Gertner, 12 Wm. & Mary Bill Rts. J. at 785 n. 93 (collecting studies); see also Lederer, 50 S.C. L.Rev. at 820 ("Four experiments have indicated that jurors perceive remote witnesses just as they perceive in-court witnesses, neither better nor worse.”).

. Some have posited that a monitor "necessarily limits the jurors' ability to see the witness’s body.” Gertner, 12 Wm. & Mary Bill Rts. J. at 786. While this ability is an important aspect of determining credibility because body language may be less controllable than facial expressions and therefore deemed an indicator of possible deception, see id., I leave room for the possibility the court could consider camera angles and capacity in deciding the adequacy of confrontation permitted by two-way video technology.

. I believe the proposed (but rejected) Federal Rule of Criminal Procedure 26(b) had attractive features. See Order of the Supreme Court, 207 F.R.D. at 99-104. It would have required a showing of necessity as a condition of presenting testimony through two-way video. See id. at 99 (allowing video testimony only if “the requesting party establishes exceptional circumstances”). Upon a showing of necessity, the court would assess the adequacy of the proposed technology and impose any procedural precautions it deems appropriate. Id. (requiring "appropriate safeguards"); see also McAllister, 34 Fla. St. U.L.Rev. at 870-71 (proposing a test for permitting two-way video testimony that includes safeguards and technical requirements).